UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF VIRGINIA
Alexandria Division

| | |
|---|---|
| MICROHITS, INC., *et al.*,<br>*Plaintiffs*<br>v.<br>MEGAUPLOAD, LTD., *et al.*,<br>*Defendants* | No. 1:12-cv-327<br>(LO/IDD) |

**REPLY BRIEF IN SUPPORT OF**
**MOTION BY DEFENDANTS KIM DOTCOM AND MEGAUPLOAD LTD.**
**FOR A STAY PENDING A PARALLEL CRIMINAL PROSECUTION**

Defendants Kim Dotcom and Megaupload Ltd. ("Defendants") have moved for a stay of this action (Doc. 16) pending the termination of a parallel criminal action, *United States v. Kim Dotcom, et al*., No. 1:12-cr-00003-LO (E.D. Va. filed Jan. 5, 2012) ("*Criminal Action*"). If required to immediately defend this civil action, Defendants will be forced to choose between asserting Fifth Amendment rights at trial in the *Criminal Action* and waiving those rights in their defense in this action, which would "constitutionally burden" Defendants' rights (Doc. 17, at 6) ("*Defendants Brief*"). Plaintiffs, Microhits, Inc. and Valcom, Inc. ("Plaintiffs"), oppose that motion (Doc. 27) ("*Plaintiffs Opp*."). Despite that opposition, the stay should be granted.

Plaintiffs make three arguments: First, they argue that Defendants do not have Fifth Amendment rights to invoke (*Plaintiffs Brief* at 4-5). That argument misconstrues the cases relied upon and misconceives of the competing interests now at issue. Second, Plaintiffs argue that Defendants are attempting to use their extradition challenges "as both a shield (against criminal liability) and a sword (against facing the instant civil matter)" to create a "'win-win' scenario" for themselves (*Id*. at 5-6). That argument overstates the delays that may result from the extradition proceedings and undervalues Defendants' right to contest extradition. Third,

Plaintiffs speculate that evidence may be "lost," Defendants might "abscond to parts unknown," and "[p]otential security breaches, technological failures, and even natural disasters could imperil the availability" of computer files now housed on the so-called Carpathia Servers (*Id.* at 6-10). None of those outcomes appears likely, let alone imminent. Thus, none of Plaintiffs' arguments is sufficient to defeat Defendants' motion for a stay.

As Defendants showed in their opening brief and explain further herein, when the Court balances Defendants' interests in a stay against Plaintiffs' interests in immediately proceeding in this civil action, the balance must be struck in favor of accommodating Defendants' Fifth Amendment rights.

## REPLY ARGUMENT

### I. THE INDIVIDUAL DEFENDANTS' FIFTH AMENDMENT RIGHTS

Plaintiffs argue that Defendants do not have Fifth Amendment rights to invoke (*Plaintiffs Brief* at 4-5). That argument fails for several reasons.

As Defendants acknowledged in their opening brief, Defendant Megaupload, Ltd., as a "collective entity," may not have its own Fifth Amendment right to assert; nonetheless, during civil discovery, it would necessarily act through the individual Defendants who have such rights, which requires that the individual Defendants' Fifth Amendment rights be accommodated (*Defendants Brief* at 7). Plaintiffs do not dispute that proposition. Instead, they contend that the individual Defendants, as "extraterritorial aliens," have no Fifth Amendment rights, either; therefore, Plaintiffs contend that none of the Defendants have Fifth Amendment interests to assert (*Plaintiffs Brief* at 2-6). That argument misconstrues the principal decision relied upon and misconceives of the interests now at issue.

The linchpin of Plaintiffs' argument (*id.* at 4-6) is their interpretation of the Supreme Court decision in *United States v. Verdugo-Urquidez*, 494 U.S. 259 (1990). In that case, a Mexican citizen and resident believed to be a leader of an organization that smuggled narcotics into the United States, was apprehended by Mexican police and transported to the United States, where he was arrested. After his arrest, federal agents, working with Mexican officials, searched his residences ***in Mexico*** and seized certain documents. *Id*. at 262-63. The issue before the high court was this: "[W]hether the ***Fourth Amendment*** applies to the search and seizure by United States agents of property that is owned by a nonresident alien and located in a foreign country." *Id*. at 261 (emphasis added). The court held that "it does not." *Id*. The court went on to emphasize that the Fifth Amendment was "not at issue" in the case, and in any event, the Fourth Amendment "operates in a different manner than the Fifth Amendment." *Id*. at 264. Thus, the holding of *Verdugo-Urquidez* has ***nothing to do*** with the application of the Fifth Amendment right against self-incrimination.

One of the ways in which the Fourth Amendment operates differently than the Fifth Amendment is the individuals to whom it applies. The Fourth Amendment secures rights for "***the people***"**—**that is, "persons who are part of a national community who have otherwise developed sufficient connection with this country to be considered part of that community." *Verdugo-Urquidez*, 494 U.S. at 265.[1] That may include citizens, resident aliens, and other aliens who have developed a "sufficient connection" with the United States.

[1] "The right of ***the people*** to be secure in their persons, houses, papers, and effects, against unreasonable searches and seizures, shall not be violated, and no Warrants shall issue, but upon probable cause, supported by Oath or affirmation, and particularly describing the place to be searched, and the persons or things to be seized." U.S. CONST. amend. IV (emphasis added).

In contrast, the Fifth Amendment rights are secured for any "***person***." *Id*. at 266.[2] The Fifth Amendment, second clause, provides without qualification that "***No person*** … shall be compelled in any criminal case to be a witness against himself." It is not confined to the protection of "citizens." Thus, its provisions, by definition, "are universal in their application, to all persons within the territorial jurisdiction, without regard to any differences of race, of color, or of nationality." *Cf. Yick Wo v. Hopkins*, 118 U.S. 356, 369 (1886) (Fourteenth Amendment "is not confined to the protection of citizens" because it applies to "any person"). The Fifth Amendment thus protects the rights of ***any*** "person" who becomes a criminal defendant in the United States—even an alien "whose presence in this country is unlawful, involuntary, or transitory." *See Mathews v. Diaz,* 426 U.S. 67, 77 (1976); *accord United States v. Pink,* 315 U.S. 203, 228 (1942) ("aliens as well as citizens are entitled to the protections of the Fifth Amendment"); *Wong Wing v. United States*, 163 U.S. 228, 238 (1886) ("all persons within the territory of the United States are entitled to the protection guaranteed" by the Fifth and Sixth Amendments, "even aliens"). Specifically, the Fifth Amendment applies to aliens "who are brought [to the United States] for trial." *In re Ross*, 140 U.S. 453, 464 (1891) (Fifth and Sixth amendments apply to "citizens and others within the United States, or who are brought there for trial"). That the individual Defendants are aliens—that is, non-citizens—is irrelevant. They will have rights under the Fifth Amendment at the trial of the *Criminal Action*, which will be held in the United States.

To be sure, "the Fifth Amendment is a ***fundamental trial right*** of criminal defendants." *Verdugo-Urquidez*, 494 U.S. at 264 (citing *Malloy v. Hogan*, 378 U.S. 1 (1964)) (emphasis

---

[2] "No ***person*** … shall be compelled in any criminal case to be a witness against himself[.]" U.S. CONST. amend. V, cl. 2 (emphasis added).

added). The individual Defendants' interest in asserting their Fifth Amendment rights, however, is not limited to the right to refuse to testify at the trial of the *Criminal Action* once they have been extradited. Even now—before extradition has been ordered and before the commencement of the trial in the *Criminal Action*—the individual Defendants may act to preserve their rights. To prevent waiver, the right against self-incrimination may be asserted prospectively "in any proceeding, civil or criminal, administrative or judicial, investigatory or adjudicatory; and it protects against any disclosures that the witness reasonably believes could be used in a criminal prosecution or could lead to other evidence that might be so used." *Kastigar v. United States*, 406 U.S. 441, 444-45 (1972). In other words, the Fifth Amendment privilege may be asserted in "any" proceeding, "civil or criminal … where the answers might incriminate [an individual] in ***future criminal proceedings***." *Lefkowitz v. Turley*, 414 U.S. 70, 77-78 (1973) (emphasis added). Thus, as explained extensively in their opening brief, the individual Defendants presently have Fifth Amendment rights to assert because they are facing criminal prosecution in federal court in the United States.

Finally, Plaintiffs' misplace their reliance on *dicta* in *Verdugo-Urquidez*, in which the court which states "we have rejected the claim that aliens are entitled to Fifth Amendment rights outside the sovereign territory of the United States" (*Plaintiff Brief* at 4) (quoting *Verdugo-Urquidez*, 494 U.S. at 269). Based on that quote, Plaintiffs argue that the individual Defendants are "aliens" who are currently "'beyond our territory' … *i.e.*, outside the United States," and therefore are not "'entitled to Fifth Amendment rights' under the U.S. Constitution" (*Id*.). That syllogism is fallacious, as it conflates ***who*** may assert Fifth Amendment rights with ***when*** and ***where*** the rights may be asserted.

That *dicta* in *Verdugo-Urquidez* regarding the Fifth Amendment is based upon the leading case of *Johnson v. Eisentrager*, 339 U.S. 763 (1950). *See Verdugo-Urquidez*, 494 at 269. The decision in *Eisentrager* involved a set of facts which—until the Guantanamo Bay detention cases[3]—had been unique. In any event, the facts are so different from those in the case at bar, that the *Eisentrager* holding has no application to the instant motion.

The issue in *Eisentrager* was "one of jurisdiction of civil courts of the United States *vis-a-vis* military authorities in dealing with enemy aliens overseas"—that is, the jurisdiction of a federal court to issue a writ of *habeas corpus* based on the petition of enemy alien war criminals captured during wartime and detained overseas. *Eisentrager*, 339 U.S. at 765. During the final throes of World War II in the Pacific theater, twenty-one German nationals were captured in China. *Id*. With the consent of the Chinese government, they were charged with war crimes, tried before a United States military tribunal, and convicted "of violating laws of war." *Id*. at 766. After their convictions, these enemy aliens "were repatriated to Germany to serve their sentences" under American military authority. *Id*. Claiming, *inter alia*, that their Fifth Amendment right to due process had been violated, these prisoners filed petitions for writs of *habeas corpus* in the United States District Court for the District of Columbia, which denied the petitions. *Id*. at 767. The court of appeals reversed and reinstated the petitions (*id*.), and *certiorari* was granted.

Justice Jackson, writing for the majority, rejected the court of appeals' reasoning and ruling: "We are cited to no instance where a court, in this or any other country where the writ [of *habeas corpus*] is known, has issued it on behalf of an alien enemy who, at no relevant time and

---

3 *See Boumediene v. Bush*, 553 U.S. 723 (2008); *Hamdan v. Rumsfeld*, 548 U.S. 557 (2006); *Hamdi v. Rumsfeld*, 542 U.S. 507 (2004); *Rasul v. Bush*, 542 U.S. 466 (2004).

in no stage of his captivity, has been within its territorial jurisdiction. Nothing in the text of the Constitution extends such a right, nor does anything in our statutes." *Eisentrager*, 339 U.S. at 768. After a careful analysis of the writ and the availability *vel non* of constitutional rights to an alien enemy captured during wartime, who is then detained, tried, and convicted overseas, Justice Jackson stated the court's holding: "We hold that the Constitution does not confer a right of personal security or an immunity from military trial and punishment upon an alien enemy engaged in the hostile service of a government at war with the United States." *Id*. at 785. Neither those facts nor that holding have any bearing on the issues now before the Court.

All three factors—***who***, ***when***, and ***where***—were indispensible to the *Eisentrager* holding: ***Who:*** German alien enemy war criminals. ***When:*** During a military tribunal. ***Where:*** In China, with the sovereign's consent. Taken together, these factors dictated the *Eisentrager* court's holding that Fifth Amendment rights did not attach.

Here, by contrast, the factors taken together dictate that the individual Defendants, even though aliens, may assert Fifth Amendment rights because they are being prosecuted in federal court in the United States, in which "all proceedings are governed by the Constitution":

- ***Who:*** An alien is a "person" for purposes of the Fifth Amendment. *Wong Wing*, 163 U.S. at 238.

- ***When:*** Constitutional rights apply whenever the United States is prosecuting a foreign national in federal court. *Verdugo-Urquidez*, 494 at 278 (Kennedy, J., concurring) (constitutional rights apply when the United States "is prosecuting a foreign national in a court established under Article III, and all of the trial proceedings are governed by the Constitution").

- ***Where:*** The trial will occur in the United States. *In re Ross*, 140 U.S. at 464 (Fifth and Sixth amendments apply to aliens "who are brought [to the United States] for trial").

Unlike the alien enemy war criminals in *Eisentrager* who were captured and tried overseas by a military tribunal, the Fifth Amendment applies because the individual Defendants are being prosecuted before a civilian Article III court in the United States—***this Court***.[4]

Since the Fifth Amendment applies in the *Criminal Action*, the individual Defendants presently have the right to seek a stay of the civil action to avoid laboring under a "constitutional burden" in both cases. Accordingly, Plaintiffs' first argument is wide of the mark.[5]

## II. THE INDIVIDUAL DEFENDANTS HAVE THE RIGHT TO CONTEST EXTRADICTION

Plaintiffs complain that by contesting extradition, instead of voluntarily appearing for their criminal trial, the individual Defendants are trying to create a "'win-win' scenario and

[4] *See also United States v. Bin Laden*, 132 F. Supp. 2d 168 (S.D.N.Y. 2001), *aff'd sub nom. In re Terrorist Bombings*, 552 F.3d 177, 201 (2d Cir. 2008), *cert. denied*, 556 U.S. 1283 (2009) ("foreign nationals interrogated overseas [before trial] but tried in the civilian courts of the United States are protected by the Fifth Amendment's self-incrimination clause"). As explained by the District Judge in *Bin Laden*, an alien criminal defendant, "insofar as he is the present subject of a domestic criminal proceeding, is indeed protected by the privilege against self-incrimination guaranteed by the Fifth Amendment, notwithstanding the fact that his only connections to the United States are his alleged violations of U.S. law." *Id*., 132 F. Supp. 2d at 181.

[5] The other decisions cited by Plaintiffs are likewise inapposite. In *Vancouver Women's Health Collective Society v. A.H. Robins Co.*, 820 F.2d 1359 (4th Cir. 1987), the court was considering whether constitutional due process rights to notice need be afforded to foreign individuals eligible to make claims in a products liability class action. And in *Zadvydas v. Davis*, 533 U.S. 678 (2001), the court was presented with the issue of whether the government may "detain a removable alien *indefinitely* beyond the removal period or only for a period *reasonably necessary* to secure the alien's removal." *Id*. at 682 (emphasis in original). The facts and holdings in those cases cannot be meaningfully applied to this case. Finally, the decision in *Territory of Hawaii v. Mankichi*, 190 U.S. 197 (1903), is one of the so-called Insular Cases, in which the Supreme Court struggled with the application of its constitutional jurisprudence in the newly acquired territories (like Hawaii) which were not "States." *See Boumediene*, 553 U.S. at 756-64. Since the time of the Insular Cases, over 100 years ago, the Supreme Court has adopted the guiding principle that the extraterritorial application of constitutional rights should "turn on objective factors and practical concerns, not formalism." *Id*. at 764.

doubly profit" in the civil case and *Criminal Action* (*Plaintiffs Brief* at 5).[6] Plaintiffs also complain that extradition from New Zealand may take a long time (*Id*. at 6-7). Those arguments should not defeat the stay motion.

As pointed out in Defendants moving papers, they are not trying to pull off a "win-win scenario," they are trying to avoid a "lose-lose scenario" in which they would suffer a constitutional burden on their rights because of the simultaneous pendency of the civil action and the *Criminal Action* (*Defendants Brief* at 8-11). They are seeking no unfair advantage by a stay, nor would one even be available to them (*Id*. at 11-3). That the delay caused by the extradition proceedings may add to the length of the stay should be considered, but at this time, should not be grounds for denying the stay. As was shown, the expected delay will not be prejudicial under the facts and circumstances of this case (*Id*.). And in Section III below, Defendants respond to Plaintiffs' speculative arguments about what might happen if a stay is granted.

Plaintiffs suggest, perhaps flippantly, that the individual Defendants are acting cravenly by "declin[ing] to face the charges handed down by a grand jury" in the *Criminal Action* (*Plaintiffs' Brief* at 6). That argument oversimplifies the international extradition process, and undervalues the rights of the individual Defendants to contest extradition.

International extradition is "the surrender by one nation to another of an individual accused or convicted of an offence outside of its own territory, and within the territorial jurisdiction of the other, which, being competent to try and to punish him, demands the surrender." *Terlinden v. Ames*, 184 U.S. 270, 289 (1902). Extradition between nations does not rest on principles of international law, but on treaties. "In the absence of an extradition treaty,

[6] Defendant Megaupload, Ltd. has not been served with process in the *Criminal Action* and is not at present the subject of extradition proceedings. *United States v. Kim Dotcom*, *et al*., No. 1:12-cr-00003-LO (E.D. Va. filed Apr. 13, 2012) (Doc. 84, hearing transcript at 18-19).

nations are under no obligation to surrender those in their country to foreign authorities for prosecution." *United States v. Alvarez-Machain*, 504 U.S. 655, 664 (1992); *Factor v. Laubenheimer*, 290 U.S. 276, 287 (1933) ("principles of international law recognize no right to extradition apart from treaty"). "Extradition treaties exist so as to impose mutual obligations to surrender individuals in certain defined sets of circumstances, following established procedures. The Treaty thus provides a mechanism which would not otherwise exist, requiring, under certain circumstances, the United States and [a foreign nation] to extradite individuals to the other country, and establishing the procedures to be followed when the Treaty is invoked." *Alvarez-Machain*, 504 U.S. at 664-65 (citations omitted). When a defendant contests extradition, he is exercising a right that is "derivative of the [responding] nation's right under" the extradition treaty. *See id.* at 667. Far from an act of craven reluctance, therefore, a defendant has the right, just as the responding nation has the right, to ensure that the terms of the extradition treaty have been satisfied by the requesting nation.

Here, there is an extradition treaty between the United States and New Zealand. 22 U.S.T. 1, T.I.A.S. No. 7035 (1970). It sets forth the offenses for which extradition may be sought, and the procedures by which extraditions are governed. Both nations, and the individual Defendants, have a strong interest in the proper and regular implementation of the treaty's provisions.

Certain delays are to be expected in any extradition case as the responding nation follows the procedures agreed upon in the treaty. That does not mean that a defendant or the responding nation is acting unfairly or improperly. Nor have Plaintiffs shown any actual or immediate prejudice that would result from the delay necessitated. This issue is addressed next, in Section III, below.

## III. PLAINTIFFS WILL NOT BE PREJUDICED

As has been shown, Plaintiffs will not be prejudiced if a stay is ordered (*Defendants Brief* at 11-13). Nonetheless, Plaintiffs speculate about a parade-of-horribles that might cause their case to "deteriorate" (*Plaintiffs Brief* at 7-8). When balancing a civil litigant's Fifth Amendment concerns against the interests of the other party, "a stay should be granted if one party requests it and the other party will not be substantially prejudiced;" to defeat the stay application, however, the other party must demonstrate "that [the stay] will result in ***genuine, substantial prejudice*** to its interests." *In re Phillips, Beckwith & Hall*, 896 F. Supp. 553, 557-58 (E.D. Va. 1995) (emphasis added). Plaintiffs show no actual and immediate prejudice, and none of their speculations about potential prejudice is likely or imminent. Thus, Plaintiffs fail to show that "genuine, substantial prejudice" will result from a stay.

First, Plaintiffs argue that if the individual Defendants are not extradited, "they may abscond to parts unknown," depriving Plaintiffs of their testimony (*Id*.). At present, however, the individual Defendants (Kim Dotcom and Mathias Ortmann) are now being detained in New Zealand pending the extradition determination, and so, this justification does not hold water. If the individual Defendants are not extradited, presumably, the stay will be lifted. Thereafter, if the individual Defendants—whether they have absconded or not—do not cooperate during civil discovery, the Court may impose coercive or punitive sanctions under Rule 37. *See Degen v. United States*, 517 U.S. 820, 827 (1996), *superseded by statute on other grounds*, 28 U.S.C. § 2466.[7] But those steps should be taken if and when prejudice appears, not now.

[7] The fugitive disentitlement statute applies to "a claim in any related civil forfeiture action or a claim in third party proceedings in any related criminal forfeiture action," but not to all civil actions. 28 U.S.C. § 2466(a). It does not disentitle a defendant from defending against civil claims.

The *Degen* case is instructive. In *Degen*, a Swiss national (Degen) had been indicted for various federal crimes but could not be extradited to the United States under the applicable treaty and was never tried. *Id*. at 822. The district court, invoking its purported "inherent power," struck Degen's defensive pleadings in a parallel civil forfeiture case simply because he remained at large in the criminal case. *Id*. The court of appeals affirmed, but the Supreme Court reversed.

The Supreme Court found that there were no grounds for striking Degen's pleadings in the civil forfeiture case. *Id*. at 822-25. (That holding has been changed by statute, as previously noted.) The court then proposed alternative means for handling the parallel civil and criminal cases. If Degen had been extradited and detained in the United States, for example, then a stay under *United States v. Kordel*, 397 U.S. 1 (1970), could have been entered or other orders entered to manage discovery conflicts between the parallel civil and criminal cases. *Id*. at 826-82. On the other hand, since Degen could not be extradited and would not be tried criminally, he would have to cooperate during civil discovery, and if he failed to do he could be sanctioned under Civil Rule 37. *Id*. at 827. Thus, the Supreme Court rejected the "rough justice" approach of automatically penalizing Degen in the civil forfeiture case simply because he could not be extradited. *Id*. at 829. Plaintiffs' "rough justice" approach in this case should be rejected, as well.

It cannot be doubted that Plaintiffs are asking the Court to impose rough justice here (*Plaintiffs Brief* at 5-6 & n.4). They want the individual Defendants to "take the bitter with the sweet," an argument rejected in *Degen*. *Degen*, 517 U.S. at 829. Here, Plaintiffs argue that Defendants must waive their rights to contest extradition in exchange for asserting their Fifth Amendment rights. As in *Degen*, such "justice would be too rough." *Id.* Moreover, the risk that the individual Defendants will later abscond is only speculation. However, if the individual

Defendants later "abscond" and thereby fail to cooperate during civil discovery, the Court will have the appropriate tools at hand to deal with that failure at that time. Thus, Plaintiffs' speculation is not a proper ground on which to deny the application for a stay.

Second, Plaintiffs also speculate that unspecified "[p]otential security breaches, technological failures, and even natural disasters could imperil the availability" of the files on the Carpathia Servers (*Plaintiffs Brief* at 9). At present, however, the files have been secured and the means of preservation are being negotiated or will be ordered by the Court; indeed, the government has already secured a significant portion for its use in the *Criminal Action*. This argument also does not defeat the stay application, and a motion to modify or lift the stay could be sought if, and when, such dire circumstances appear imminent.

Third, Plaintiffs speculate that unspecified "potential degradation of data and witness memory (and even availability)" may occur if a stay is granted (*Plaintiffs Brief* at 10). At present, however, as shown above regarding the Carpathia Servers, this sort of unfocussed speculation is not a ground for denying the stay.

Finally, Plaintiffs speculate that their "ability to recover on a finding of liability" will be compromised by a stay (*Plaintiffs Brief* at 10). At present, however, every asset the government could find has been seized pending forfeiture. Until the *Criminal Action* is resolved or those assets are otherwise released, those assets are likely to remain frozen, and everyone else, including Plaintiffs, can do no better than second-in-line behind the government. *See* 21 U.S.C. § 853(c) (forfeiture relation-back provision); *Caplin & Drysdale*, *Chtd. v. United States*, 491 U.S. 617, 627-28 (1989) (title to forfeitable assets vests in government upon commission of

crime and cannot be transferred pretrial).[8] Thus, Plaintiffs' speculation about the future collectability of a potential civil judgment for un-liquidated money damages is not a ground for denial of the stay, either.

**CONCLUSION**

For the reasons argued above and in their opening brief, Defendants Kim Dotcom and Megaupload Ltd. respectfully submit that the Court should enter an order staying this civil action until the termination of the *Criminal Action*.[9]

Dated: May 29, 2012

Respectfully submitted,

/s/ Craig C. Reilly
Craig C. Reilly, Esq. (VSB # 20942)
111 Oronoco Street
Alexandria, Virginia 22314
TEL (703) 549-5354
FAX (703) 549-2604
craig.reilly@ccreillylaw.com

Ira P. Rothken (*pro hac vice*)
Jared R. Smith (*pro hac vice*)
ROTHKEN LAW FIRM
3 Hamilton Landing
Suite 280
Novato, CA 94949
(415) 924-4250
(415) 924-2905 (fax)
ira@techfirm.net

*Counsel for Defendants Kim Dotcom and Megaupload, Ltd.*

[8] Defendants nonetheless may seek relief under *United States v. Farmer*, 274 F.3d 800 (4th Cir. 2001), to contest whether all of assets seized are forfeitable.

[9] Defendant Mathias Ortmann purportedly has been served in New Zealand (Doc. 29), and he should be covered by the stay, as well.

**CERTIFICATE OF SERVICE**

I hereby certify that on May 29, 2012, the foregoing pleading or paper was filed and served electronically by the Court's CM/ECF system upon all parties:

William Clifton Holmes
DUNLAP, GRUBB & WEAVER PLLC
199 Liberty St SW
Leesburg, VA 20175
703-777-7319
Fax: 703-777-3656
Email: cholmes@dglegal.com
*Counsel for Plaintiffs*

/s/ Craig C. Reilly
Craig C. Reilly, Esq. (VSB # 20942)
111 Oronoco Street
Alexandria, Virginia 22314
TEL (703) 549-5354
FAX (703) 549-2604
craig.reilly@ccreillylaw.com
*Counsel for Defendants Kim Dotcom and Megaupload, Ltd.*